525 F.2d 394
 Warner S. KELLY and Samuel S. Parras, Appellees,
v.
Lou V. BREWER, Warden of the Iowa State Penitentiary at Fort
Madison, Iowa, Appellant.
Warner S. KELLY and Samuel S. Parras, Cross-Appellants,
v.
Lou V. BREWER, Warden of the Iowa State Penitentiary at Fort
Madison, Iowa, Cross-Appellee.
 Nos. 75--1523, 75--1562.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 11, 1975.
Decided Nov. 19, 1975.
 
 Lorna Lawhead Williams, Sp. Asst. Atty. Gen., Des Moines, Iowa, for Lou V. Brewer, Warden.
 Charles Pulaski, University of Iowa, College of Law, Iowa City, Iowa, for Warner S. Kelly and Samuel S. Parras.
 Before GIBSON, Chief Judge, HENLEY, Circuit Judge, and VAN PELT, Senior District Judge.*
 HENLEY, Circuit Judge.
 
 
 1
 These two appeals arise from litigation instituted in the United States District Court for the Southern District of Iowa[1] by Warner S. Kelly and Samuel S. Parras, inmates of the Iowa State Penitentiary at Fort Madison, Iowa, against Lou V. Brewer, Warden of that institution.
 
 
 2
 Plaintiffs alleged in substance that their initial and continued confinements in 'administrative segregation' at the discretion of the defendant without prior hearings and without meaningful periodic evaluations of their cases by reference to appropriate standards constituted cruel and unusual punishment prohibited by the eighth amendment to the Constitution of the United States as carried forward into the fourteenth amendment and also involved denials of due process of law and of the equal protection of the laws guaranteed by the fourteenth amendment itself. Subject matter jurisdiction was predicated upon 42 U.S.C. § 1983 read in connection with 28 U.S.C. § 1343(3). Only declaratory and injunctive relief was sought; there was no claim for money damages.
 
 
 3
 Kelly tendered his petition in September, 1973; the district court permitted the petition to be filed in forma pauperis and appointed counsel drawn from the faculty of the University of Iowa College of Law to represent the plaintiff. Counsel filed an amended complaint on behalf of Kelly. Later the same attorneys filed a similar complaint on behalf of Parras; while the complaint of Parras contains some 'class action' allegations, it appears from the record that both cases were treated by court and counsel simply as individual suits. The cases were consolidated, and we will treat them as though they were one case.
 
 
 4
 'Administrative segregation,' as it is practiced at the Iowa State Penitentiary and as applied to the plaintiffs, is a form of solitary confinement which is described in detail in the initial findings of fact and conclusions of law filed by the district court following an evidentiary hearing and reported as Kelly v. Brewer, 378 F.Supp. 447 (S.D.Ia.1974).[2] The trial court's findings and conclusions were implemented by an interlocutory order denominated a 'Judgment,' that was filed on June 6, 1974.
 
 
 5
 The record reflects that Parras was placed in administrative segregation initially after he attacked a prison guard and inflicted a non-fatal stab wound in February, 1972. Later in 1972 Parras was prosecuted in the state courts, was found guilty and received a sentence of imprisonment for thirty years. The record further reflects that Parras, a man of advancing years, who has a serious mental illness, and who is losing his sight, has a long criminal record going back to 1933.
 
 
 6
 On June 8, 1972 Kelly, who was already in administrative segregation, attacked and killed a prison guard. Kelly was charged with murder and was convicted of second degree murder in May, 1973; he received a sentence of imprisonment for ninety years to be served concurrently with the sentence or sentences that he was already serving when he killed the guard. Kelly is a much younger man than Parras, and while his criminal record is not as long as that of Parras, it is still substantial.
 
 
 7
 It is clear that both plaintiffs are recidivist criminals and both have a history of violent behavior both inside and outside prison. Following the commission of their respective acts that have been mentioned, both men were immediately placed in administrative segregation without prior hearings. They were kept in segregation prior to their convictions, and following their convictions they were immediately returned to segregation, again without any prior administrative hearings. And they remained in that status with some intermissions until released to general population in mid-July, 1975 following the final judgment of the district court which was filed on June 18, 1975.[3]
 
 
 8
 The first evidentiary hearing in the district court was held on February 13, 1974. At that hearing the court heard the testimony of Kelly with respect to his confinement. The defendant did not testify, but the parties filed a written stipulation as to what his testimony would have been had he been present. In addition to that stipulation, both sides introduced documentary evidence.
 
 
 9
 The 1974 findings, conclusions and order of the district court are set forth in full in Kelly v. Brewer, supra, and all of them need not be restated here. Suffice it to say that the 1974 decision of the district court was in part favorable to Kelly and in part adverse to him. Some of the district court's findings and conclusions are applicable to the case of Parras; some are not.
 
 
 10
 The most significant 1974 holding of the district court, and the principal one involved in this case, relates to the post-conviction confinement of Kelly in administrative segregation. As to that confinement, the district court found that Kelly's conviction of murder in itself justified the defendant in isolating Kelly without prior hearing at least for a limited period of time. The district court held, however, that it is a violation of due process of law for a prison administrator to retain an inmate in administrative segregation, involving solitary confinement and certain deprivations to which the general inmate population was not subject, for a prolonged or indefinite period of time without meaningful periodic evaluations, to be made in the light of appropriate criteria, to determine whether the inmate is still a security risk who should be kept in segregation or whether it has become safe to return him to general population.
 
 
 11
 The district court found that while inmates situated as was Kelly were supposed to have their cases evaluated once a month by staff panels which would presumably make recommendations to the Warden, in point of fact the question of whether or not an inmate would be returned to population was one that addressed itself to the unfettered discretion of the Warden, and that the monthly evaluations were mere shams and were of no practical value to the inmates involved.
 
 
 12
 On this aspect of the case the district court's initial judgment declared, among other things, that Kelly's continued confinement in indefinite administrative segregation constituted a violation of due process of law 'given there is no meaningful review under appropriate standards to determine whether the plaintiff remains a threat to the security of the institution and thus be continued in 'indefinite administrative segregation." (378 F.Supp. at 455.) And the court affirmatively ordered that 'meaningful standards be developed to determine and review the issues relating to plaintiff's 'indefinite administrative segregation' and that the plaintiff be given proper periodic hearings under these standards to determine whether he can be released into the general prison population. A plan to accomplish this result with the appropriate standards is to be submitted to this Court within sixty (60) days of the filing of this Order. The plaintiff will not be ordered released from 'administrative segregation' at this time.' (378 F.Supp. at 455--56.)
 
 
 13
 In due course, the Warden submitted a plan, and counsel for the plaintiffs submitted a counter-plan.[4]
 
 
 14
 The Warden's plan promised periodic evaluations of inmates confined in administrative segregation, including annual psychiatric evaluations, and set out a number of criteria, most of which were non-objective. Under the plan ultimate determination of whether an inmate should be retained in segregation would be made by the Warden personally, subject to review by his own administrative superiors and also subject to possible judicial review.
 
 
 15
 The counter-plan was much more objective than the Warden's plan. The counter-plan conferred authority to evaluate the case of an inmate in segregation upon a Segregation Review Committee consisting of three persons. The Committee was required to conduct its review in the light of the standards set out in the plan. Should the Committee decide that the inmate in question no longer posed a threat to institutional security, it was required to order his return to population, and such a decision could not be reversed by the Warden. The counter-plan did recognize that the Warden had the power at any time to release a convict from his segregated status.
 
 
 16
 While the plans of both sides were drawn as what may be called 'class plans,' the district court made it clear at the commencement of the second hearing which was held on April 29, 1975, that it was primarily interested in a plan to be applied to Kelly and Parras, and that it would not approve any 'class plan' unless counsel on both sides were able to agree on one. This counsel were avowedly unable to do, at least with respect to convicts in the particular situation of Kelly and Parras.[5]
 
 
 17
 In the course of the hearing the district court received in camera the testimony of the Prison Ombudsman,[6] who expressed the view that the plans put forward by the Warden would accomplish nothing except to formalize the existing procedures which the district court had found to be meaningless.
 
 
 18
 Based on its review of the conflicting proposals and on its familiarity with the case the district court concluded that the plan submitted by the Warden did not provide any meaningful review of Kelly's case and did not cure 'the primary defect of defendant's existing system--namely, the defendant's possession of an unbridled discretion to retain a disliked inmate continually in indefinite status.' The court then concluded that the counter-plan was more objective than that of the Warden, 'and more nearly meets the Due Process objections voiced by the Court in its June 6 (1974) Order.'
 
 
 19
 The court then mentioned the limited function of a federal court in a case of this kind, and said:
 
 
 20
 . . . (I)t is clear that the proposed plans encompass many matters not directly related to the real issue before the court, namely, whether the prison treatment of the plaintiffs constituted a denial of their rights to Due Process of the law. Thus, to the extent that any plan is endorsed by this Court it can only be in relation to the factual settings presently before it.
 
 
 21
 The district court then ordered the counter-plan applied to Kelly and Parras within thirty days, and that if no disposition of them was made under the plan within that period, they were to be released into the general prison population. A formal order to that effect was filed by the clerk of the district court on June 18, 1975.
 
 
 22
 On July 15, 1975, four days before the thirty-day period prescribed by the district court expired, the defendant filed a notice of appeal and an application for stay of judgment. On July 16 the district court denied a stay, and later a stay was denied by this court. On or after July 19 plaintiffs were perforce released into general population; we presume that they are still there; how they have fared we do not know.
 
 
 23
 In his direct appeal (No. 75--1523) the defendant contends that the district court erred in requiring the submission of a plan to be approved by the court in advance of application. Alternatively, the defendant contends that the district court erred in rejecting his plan and ordering the counter-plan applied to plaintiffs.
 
 
 24
 In his cross appeal (No. 75--1562) Kelly contends with respect to the June, 1974 order of the district court that that court erred in rejecting in part his cruel and unusual punishment and due process contentions, and in rejecting his equal protection claim in toto.[7]
 
 
 25
 The questions raised by Kelly's cross appeal are not insubstantial in themselves and might well call for discussion and decision in some circumstances. However, in view of the fact that this is not a class action, that no money damages are sought, and that Kelly has now been released from segregation, we think that the questions raised by him on cross appeal have become abstract and should not be decided here except to the extent that some of them may be significant in connection with the defendant's direct appeal.
 
 
 26
 Turning now to that appeal, we recognize at the outset, as did the district court, that it is not the function of federal courts to embroil themselves unduly in matters of prison administration or of the classification of convicts or of prison security. In those areas much must be left to the discretion of prison administrators, and in a given case a federal court should go no further than constitutional necessities require. However, we also recognize that convicts have certain rights that are protected by the Constitution of the United States. The federal courts have both the power and the duty to protect those rights effectively, and, as courts of equity, they have broad discretion in devising appropriate remedies. See e.g., Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Cruz v. Beto,405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). The principles just stated have been recognized by this court in many cases, including: Jackson v. McLemore, 523 F.2d 838 (8th Cir. 1975); Teterud v. Burns, 522 F.2d 357 (8th Cir. 1975); Mason v. Ciccone, 517 F.2d 73 (8th Cir. 1975); Willis v. Ciccone, 506 F.2d 1011 (8th Cir. 1974); Finney v. Arkansas Board of Correction, 505 F.2d 194 (8th Cir. 1974); Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), cert. denied, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972); Holt v. Sarver,442 F.2d 304 (8th Cir. 1971); Courtney v. Bishop, 409 F.2d 1185 (8th Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Sharp v. Sigler, 408 F.2d 966 (8th Cir. 1969); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).
 
 
 27
 We are concerned here ultimately with the constitutionality of the continued confinement of the plaintiffs as individuals in indefinite administrative segregation after their respective convictions in the state courts. No contention is made that this constitutional controversy between plaintiffs and the defendant about their post-conviction confinement has been mooted by their ultimate return to population against the will of the defendant.
 
 
 28
 No claim is made that administrative segregation is per se or necessarily unconstitutional. It is safe to say that in all prisons, except perhaps some extremely minimum security institutions, it is found to be absolutely necessary for a number of non-punitive reasons to segregate individual inmates from the general prison population, and to hold them in segregated status for varying or indefinite periods of time. See Burns v. Swenson; Sharp v. Sigler; Courtney v. Bishop, all supra.
 
 
 29
 Unlike punitive segregation, including punitive isolation which is imposed by way of punishment for past misconduct, administrative segregation is not punitive and it looks to the present and the future rather than to the past. It involves the exercise of administrative judgment in determining whether an inmate should be segregated from the general population and predicting what he will probably do or have done to him if he is permitted to remain in population or to return to population after a period of segregation.
 
 
 30
 While objective standards may be useful tools in making the determinations and predictions just mentioned, and while psychological and psychiatric evaluations of individual inmates may also be helpful, it seems to us that in view of the nature of the problems involved the ultimate decision in a given case must be left to the informed judgment, including discretionary judgment, of prison administrators, subject to review by their own superiors and ultimately by the courts in proper cases. And where the problem arises in a given institution, we think that the decision should be made by or under the supervision of the head of that institution rather than by a panel of subordinate prison employees.
 
 
 31
 While, as stated, administrative segregation is not inherently unconstitutional, its validity depends upon the relative humaneness of the conditions of the segregated confinement and in individual cases upon the existence of a valid and subsisting reason or reasons for the segregation, such as protection of the segregated inmates from other inmates, protection of other inmates and prison personnel from the segregated inmates, prevention of escapes and similar reasons. It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for past misconduct. Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future.
 
 
 32
 Since there must be a valid and subsisting reason for holding an inmate in segregation, we agree with the district court that where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population. We think it should be said, however, that what would be required for an intelligent and meaningful review of the case of one inmate might not be required in the case of another.
 
 
 33
 The district court found ultimately that the review procedures that had been followed in the cases of the plaintiffs from 1972 down to the date of the final opinion of June 16, 1975 had not been meaningful and did not satisfy the requirements of due process of law. That finding has substantial evidentiary support in the record, and we cannot say that it was clearly erroneous.
 
 
 34
 Nor can we say that the district court abused its discretion in refusing to direct the Warden's plan to be applied to the plaintiffs, although we doubt that the plan was subject to the severe strictures to which it was subjected by the district court.
 
 
 35
 On the other hand, we are of the opinion that the district court erred in ordering the counter-plan applied to plaintiffs and in ordering their return to population unless their further segregation could be justified by reference to that plan.
 
 
 36
 Under that plan the Segregation Review Committee would have been empowered to return plaintiffs to population against the will of the Warden, and as a matter of fact it might have turned out that the Committee would have been required to so act regardless of what the members of the Committee may personally have thought about the safety or wisdom of the action in question.
 
 
 37
 We think that the relief granted was too rigorous and substantially exceeded what the constitutional necessities of the case required. In our opinion the constitutional problems of the plaintiffs might well have been solved by a simpler approach, and we think that that approach should now be taken.
 
 
 38
 As we read the record, including the stipulated testimony of the Warden, he has never evaluated the case of either plaintiff outside the framework of certain underlying penological views, which are as follows: (1) That an inmate who is convicted of killing or attempting to kill a member of the prison staff automatically falls into a particular category which is separate and distinct from categories occupied by other inmates, including inmates who have been convicted of killing or attempting to kill people in the outside world. (2) That the conviction of the inmate in question ipso facto establishes, prima facie, if not conclusively, that the inmate is a fit subject for administrative segregation for a prolonged and indefinite period of time and perhaps for the duration of his term of imprisonment. (3) That indefinite segregation of an inmate so convicted may be justified, at least in part, by its supposed deterring effect on other inmates. (4) That the possibility of negative staff reaction to the return of the inmate to population may validly be taken into consideration in determining whether the inmate is to be kept in segregation. Obviously, those views working in combination make it virtually impossible for an inmate like Kelly or Parras ever to persuade the Warden that he should be returned to population. Indeed, the Warden concedes that during his tenure as Warden, which began in 1969, only one inmate occupying the status of Kelly and Parras has ever been released from administrative segregation. That individual was convicted of assaulting a guard with intent to kill him; the inmate was placed in administrative segregation where he behaved well, and his return to population was recommended by I.S.M.F. He was not returned to population; he was transferred to another Iowa institution.
 
 
 39
 We recognize that an inmate who while in prison commits and is convicted of what the counter-plan calls a 'homicidal offense' directed at a guard or other member of a prison staff may present, at least for a time and up to a point, a security problem that is not present in the case of an inmate who has been sent to the Penitentiary for having committed a similar offense in the free world. We do not think that that fact, however, permits a prison warden constitutionally to apply the other views that have been mentioned so as to keep the convicted inmate confined indefinitely in administrative segregation.
 
 
 40
 As to deterrence and 'negative staff reaction,' whatever that term may mean, it may be conceded that to confine in isolation an inmate who kills a guard may deter some other inmate or inmates from doing the same thing; and it may also be conceded that prison staff members may be displeased or resentful if the killer is released from segregation.
 
 
 41
 But, those things to our mind are simply irrelevant in the context in which we are now dealing. They are considerations that are foreign to the basic purpose of valid administrative segregation. That purpose is not to punish the segregated inmate, or to influence the conduct of other inmates, or to protect the segregated inmate from retaliation at the hands of prison personnel, or to satisfy their vindictiveness.
 
 
 42
 As to the weight to be given to the 1972 and 1973 convictions of the respective plaintiffs, we do not quarrel with the district court's conclusion in the Kelly case that Kelly's conviction of murdering the guard in itself justified the Warden in isolating him and keeping him in isolation 'until a reasonable decision can be made that he poses no threat to the security of the institution.' 378 F.Supp. at 454. It does not follow, however, that the Warden can take the view that the fact of the conviction in and of itself stands as a bar to the making of a reasonable decision that at some future time the inmate poses no threat to the security of the institution. This does not mean, of course, that the Warden may not properly consider the underlying acts of the plaintiffs and the fact of their convictions as historical facts of their cases and as factors to be considered, among others, in determining whether after a lapse of months or even of years it is safe to terminate their segregated status. But, we do not think it permissible for the Warden to give artificial weight to the convictions or to consider them as determining or preponderant guidelines in deciding whether or not plaintiffs can safely be returned to population.
 
 
 43
 As has been said, the record does not indicate that Warden Brewer has ever evaluated the cases of these plaintiffs without regard to the criteria that we have found constitutionally impermissible; and we think that he should have an opportunity to do so. Plaintiffs' witness, the Ombudsman, himself testified to the fact that the defendant is a fair minded man. We will not presume that if he had occasion to evaluate the cases of the plaintiffs today, he would be unable or unwilling to do so free from the views which we have condemned.
 
 
 44
 Accordingly, we reverse the final order of the district court and remand the case for further proceedings.
 
 
 45
 In connection with the remand the district court should first ascertain the present status of the plaintiffs and the Warden's present inclinations with respect to them. If they are still in population, as we presume they are, and if the Warden is not inclined to resegregate them as long as they conduct themselves in an acceptable manner, that is the end of the matter.
 
 
 46
 If the Warden is inclined to return either plaintiff to administrative segregation at this time, the district court will direct the Warden to conduct personally an appropriate evaluation of that plaintiff's case without giving undue effect to his past conduct and conviction and without regard to considerations of deterrence and 'negative staff reaction.' If the Warden determines upon evaluation that there is no occasion to return that plaintiff to segregation, there again is the end of the matter as far as the inmate in question is concerned.
 
 
 47
 If the Warden determines after evaluation that either of the plaintiffs should be returned to segregation at this time, he should report his determination to the district court, and should set out his reasons therefor, and identify the criteria and standards which he employed in reaching his determination. That determination can then be reviewed by the district court and may be set aside if the district court determines that the Warden employed improper standards, or that in coming to his conclusion he acted arbitrarily, or capriciously, or abused his administrative discretion. If judicial review of the determination calls for a further hearing or further hearings, the district court will be free to hold the same. Should the district court find that the initial evaluation by the Warden was inadequate, the court may order the defects supplied. And if the district court upholds an initial determination adverse to either plaintiff, it may order that periodic reevaluations be conducted in the future.
 
 
 48
 Assuming that the Warden permissibly finds that Parras should not continue to live in the general population, we think that the Warden might do well to consider whether in lieu of a return to administrative segregation Parras, in view of his age and his physical and mental condition, should not be transferred, whether he likes it or not, to the I.S.M.F. or some other state institution of a hospital type.
 
 
 49
 Returning briefly to the district court's order of June 6, 1974, we affirm those portions of it favorable to Kelly. Kelly's cross appeal with respect to those portions of that order adverse to him is dismissed as being moot at this time.
 
 
 50
 The district court's final order or judgment of June 18, 1975 is reversed, and the case is remanded for further proceedings in accordance with this opinion.
 
 
 
 *
 The Honorable Robert Van Pelt, United States Senior District Judge for the District of Nebraska, sitting by designation
 
 
 [1]
 The Honorable William C. Hanson, Chief Judge
 
 
 [2]
 While the two cases had been consolidated, Parras did not appear at the evidentiary hearing which was held in February, 1974, and his case was continued. The hearing dealt almost exclusively with the case of Kelly, and the district court's findings and conclusions related to Kelly alone. However, the evidentiary material received bore in some measure on the Parras case, and in most respects the two cases are quite similar
 
 
 [3]
 The conditions of Kelly's periods of confinement are described in detail in the 1974 findings and conclusions of the district court. The initial period of his confinement which lasted from June 8 to June 12, 1972 was extremely severe and was described by the district court as 'subhuman and subanimal;' during that period of time he was confined in a darkened 'strip cell' without clothing, shoes or sanitary facilities, except for a built-in commode. On June 12 Kelly was removed to the Iowa Security Medical Facility (I.S.M.F.) at Oakdale and remained there until August 9, 1972 when he was returned to the Penitentiary and immediately put back into segregation. He remained in that status until April, 1973 when he was transferred to the Wapello County Jail to stand trial for murder. Upon his return to the Penitentiary, he was again placed in indefinite administrative segregation where he remained without significant interruption of his solitary confinement until his ultimate release to population
 
 
 [4]
 The Warden's 'plan' was actually an original and a supplemental plan. The plan submitted by counsel for the plaintiffs will be referred to as the 'counter-plan.'
 
 
 [5]
 According to the stipulated testimony of the Warden, convicts confined in administrative segregation fall into a number of categories, including a category consisting of inmates who have been convicted of assaulting or murdering a member of the Penitentiary staff. During the time with which we are concerned, that was a very small category consisting of not more than four men, including the plaintiffs
 
 
 [6]
 The Prison Ombudsman is an employee of the Iowa Citizens' Aid which is a state agency charged with protecting or promoting the interests of private citizens having complaints against state or local governmental agencies in Iowa
 
 
 [7]
 Parras is nominally a cross-appellant along with Kelly. However, counsel for plaintiffs concedes in his brief that Parras has no standing to complain of the 1974 order, and we consider that the cross appeal has been abandoned as far as Parras is concerned