**Robert G. McCRAY, Plaintiff,**

v.

**Larry D. BENNETT, Commissioner of the Board of Corrections, Thomas Staton, Marion Carroll, John Vickers, Louis Wilkinson, and W. F. Hamner, Members of the Alabama Board of Corrections, Eddie Nagle, Joseph Oliver, and General Caldwell, Members of the Segregation Review Board, Defendants.**

**Civ. A. No. 78–27–N.**

United States District Court, M. D. Alabama, N. D.

Dec. 15, 1978.

John L. Carroll, Montgomery, Ala., for plaintiff.

William J. Baxley, then Atty. Gen., and Larry R. Newman and Linda C. Breland, Asst. Attys. Gen., State of Alabama, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

JOHNSON, Chief Judge.

Plaintiff Robert G. McCray, an inmate in the Alabama prison system, challenges as unconstitutional the sentencing practices followed in confining prisoners to segregation cells for disciplinary reasons. He sues under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C. § 1983. He invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343(3). McCray sues on his own behalf and on behalf of all inmates who have been, are, or will be arbitrarily confined to segregation. As defendants he names Larry D. Bennett, Commissioner of the Board of Corrections; Thomas Staton, Marion Carroll, John Vickers, Louis Wilkinson, and W. F. Hamner, Members of the Alabama Board of Corrections; and John Edward Nagle, Joseph A. Oliver, and Gene T. Cardwell,[1] Members of the Segregation Review Board. Each is sued individually and in his official capacity. Plaintiff seeks declarative and injunctive relief for himself and the class.

This case was tried before the Court on the merits of plaintiff's claims; both parties presented testimony and evidence, and having considered the evidence, the Court incorporates in this memorandum opinion the following findings of facts and conclusions

---

1. In the complaint, defendant John Edward Nagle was named as Eddie Nagle and defendant Gene T. Cardwell was incorrectly named as "General Caldwell."

of law, as authorized by Rule 52 of the Federal Rules of Civil Procedure.

## Class Certification

Plaintiff McCray requests that the Court allow him to sue on behalf of a class composed of all inmates of the prison system of the State of Alabama who have been, are, or will be arbitrarily confined to punitive segregation. The Court finds that this suit is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Court finds that the class is so numerous that joinder of all members is impracticable; that there are questions of law and fact common to the class; that the claims of the representative parties are typical of the claims of the class; and that the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). Further, the Court finds that the defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole. Fed.R.Civ.P. 23(b)(2).

In this suit the named plaintiff asserts that the defendants have violated his rights to due process and equal protection of the laws. To support his equal protection claim, he argues that black prisoners are confined to and retained in punitive segregation in a racially discriminatory manner. In light of the separate claims presented by the representative plaintiff, the Court considers it appropriate to divide the class into subclasses: (1) all inmates of the prison system of the State of Alabama who have been, are, or will be arbitrarily confined to and retained in punitive segregation; and (2) all black inmates of the prison system of the State of Alabama who have been, are, or will be confined to and retained in punitive segregation on account of their race. Fed.R.Civ.P. 23(c)(4).

## Facts

The segregation unit for the entire Alabama penal system is located at Holman Prison. All inmates who are sentenced to segregation are transferred to Holman. The segregation unit is located on the west side of Holman prison; it consists of 244 individual cells, including 48 cells in the old death row unit. Not all of these cells are in operation at the present time. Inmates who are housed in the segregation unit are restricted to single cells. They are not allowed to work. They receive a maximum of thirty minutes of exercise per day. They have no access to the general population of the prison. They are allowed to have visitors, but even on these occasions they are kept isolated from the rest of the prisoners. Normally, a prisoner is released from his segregation cell only when he is accompanied by two guards.[2]

Inmates are assigned to the segregation unit for a number of different reasons. Some are there at their own request; they are considered to be in "safekeeping" or "non-punitive isolation." Others, suspects in serious prison incidents, are isolated there for a relatively short time during investigations into the incidents. Known homosexuals are housed there. Inmates who are classified as "maximum custody" or "close custody" prisoners, designations given to individuals with histories of institutional violence, also are confined in the segregation unit. In addition, prisoners who are deemed escape risks are placed in segregation. Finally, some men are confined to segregation cells as punishment for violating prison rules. It is this last group, those in punitive segregation, who are the subject of this suit.

An inmate can be sentenced to punitive segregation if a prison disciplinary board convicts him of a major infraction.[3] A dis-

---

**2.** Close custody prisoners are treated differently; a small group of them may be released from their cells in the presence of one guard.

**3.** Major infractions are defined in *Handbook of Rules and Information for Inmates* (November 15, 1977), 42–46. They vary widely, including fighting, assaulting an officer, gambling, refusing to work, insubordination, aiding and abetting the violation of institutional rules or regulations, reporting late from leave or pass, and other offenses.

ciplinary board, composed of three prison officials, is convened when a prisoner is accused of violating certain prison rules. If the board, after hearing the witnesses and other evidence presented by the prisoner and by his accusers, finds the prisoner guilty, it may sentence him to segregation. The disciplinary board has the power to sentence an inmate either to a fixed term (e. g., six months) or to an indeterminate amount of time (e. g., "six months or until released by the Segregation Review Board").[4] In practice, the disciplinary boards mete out indeterminate sentences a majority of the time.

Two boards review prisoners sentenced to segregation. The Institutional Segregation Review Board, composed of the warden, the chaplain, and the senior classification officer, meets weekly. Its power is limited; it can release only those inmates who have completely served a fixed term, not those who are serving indeterminate sentences. The Board members review the files of all those in punitive segregation. The inmates do not appear in person. The weekly meeting takes approximately two hours.

The Administrative Segregation Review Board, composed of the commissioner or his designee, the warden or his deputy, the senior classification officer, the chaplain supervisor, and the assistant director of social services, meets every sixty days. It reviews the files of those held in maximum and close custody, as well as those confined to punitive segregation. It has the power to change classifications and to release inmates serving indeterminate sentences.

The bi-monthly review follows a fixed format. Inmates are called before the Board one at a time. A Board member asks whether the prisoner is receiving his exercise, meals, showers, and visits from medical personnel. The inmate then is given a chance to address the Board. He may submit pertinent documents, but may not present witnesses in his behalf. After the inmate leaves, the Board members discuss

his case. Three prison officials—a classification officer and two psychologists—who are not members of the Board but are customarily present join in the discussion and offer their opinions as to whether the prisoner should be released from segregation. In addition, the Board often solicits information about the inmate from guards who are in the room. After this discussion the five Board members reach a consensus decision; they do not take a vote. At no time in their deliberations do the members of the Segregation Review Board rely on written guidelines in determining when inmates should be released from segregation. In fact, no list of criteria to be considered in evaluating the behavior of inmates in segregation exists.

The inmates in punitive segregation learn of the Board's decision a few days later when a list of those to be released from the segregation unit is published. They do not receive a statement of reasons for the Board's actions in their individual cases. They receive neither a written explanation of the Board's operations nor a description of the behavior that is required of them before they can be released from segregation.

*Due Process Claim*

The Court concludes that this system violates the prisoners' rights to due process. The Supreme Court has delineated the due process requirements which must be present when prison officials punish inmates for serious misconduct. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The due process issue, however, arises in a somewhat different context in the case at bar. The plaintiff class does not contest the procedures of the disciplinary boards which sentence prisoners to punitive segregation. Rather the class complains of the procedures, or lack of them, used by the boards which review and retain inmates in segregation. The class contends that the role of the review boards is an especially

---

4. A few inmates are sentenced to purely indeterminate sentences ("Segregation until released by the Segregation Review Board").

crucial one in light of the frequent imposition of indeterminate sentences.

Courts which have examined this issue have stated that due process requires a meaningful review of prisoners held in segregation for an indefinite length of time. *Kelly v. Brewer,* 525 F.2d 394 (8th Cir. 1975); *Fitzgerald v. Procunier,* 393 F.Supp. 335 (N.D.Cal.1975).[5] As the court declared in *Kelly v. Brewer* :

> [T]he reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. . . . [W]here an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards . . . .

525 F.2d at 400.

The review decision is only meaningful if made in light of relevant, objective criteria. *Finney v. Hutto,* 410 F.Supp. 251 (D.Ark. 1976), *aff'd* 548 F.2d 740 (8th Cir. 1977), *aff'd,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Hardwick v. Ault,* 447 F.Supp. 116 (N.D.Ga.1978). The *Hardwick v. Ault* court focused on this issue in its criticism of the nebulous criteria used by the review panel to determine whether inmates confined for indefinite terms should be released or retained.

> The method now used by the state to choose which prisoner shall leave [segregated confinement] is the epitome of arbitrary state action forbidden by the Fourteenth Amendment. . . . [I]nmates are expected to comport with a certain standard of behavior, but they are not told or given a written explanation of what that standard is. Procedural due process requires, as a minimum, that no-

tice be given of the rules. . . . Under these circumstances, simple fairness requires that the rules be written and that they create objective criteria by which to gauge the progress of an . . inmate.

447 F.Supp. at 124.

■ Applying these principles to the evidence in this case compels the conclusion that the present system in the Alabama prisons of reviewing prisoners confined to punitive segregation is inadequate and unconstitutional. In reaching this conclusion, the Court recognizes that discipline and administration of state detention facilities are state functions. *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968). Moreover, prison officials must have broad discretion in the daily operation of the correctional system. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Although federal courts do not sit to supervise state prisons, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), nonetheless, in some instances the courts must intervene to enforce the constitutional rights of prisoners. *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd in part sub nom. Newman v. State of Alabama,* 559 F.2d 283 (5th Cir. 1977), *aff'd in part sub nom. Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). *See Procunier v. Martinez, supra,* 416 U.S. at 405-06, 94 S.Ct. 1800.

■ The evidence submitted in this case demonstrates that the Segregation Review Boards afford only the most perfunctory review. The weekly Board reviews the files of more than one hundred inmates in two

---

**5.** Although *Kelly* and *Fitzgerald* and other cases concern the review of inmates who are in segregation for non-punitive reasons, the salient fact is that they are in segregation for an indefinite term—as are members of the plaintiff class in this suit. It appears that most of the reported cases concerning review of segregation prisoners involve "administrative" segregation. This is not surprising because inmates in "administrative" segregation are generally placed there for an indeterminate term.

In any event, it is recognized that the punitive segregation situation requires more procedural safeguards than administrative segregation. *Bruce v. Wade,* 537 F.2d 850, 854 n. 9 (5th Cir. 1976); *Sweet v. Department of Corrections,* 529 F.2d 854, 861 (4th Cir. 1975); *Cook v. Brockway,* 424 F.Supp. 1046, 1051 n. 8 (N.D.Tex.1977).

hours. The bi-monthly Board spends approximately six and one-half hours reviewing more than one hundred cases. This time includes interviews with most of the inmates, questioning of the correctional guards, and discussion of each case by the eight officials present. Simple arithmetic leads to the conclusion that an average of four minutes or less is allotted to a case. It is difficult to conceive of any meaningful assessment being made in such a short time.[6]

The procedure is also inadequate for another reason: the lack of expressly articulated factors to guide the review. Board members have no list of objective criteria to assist them in deciding whether to release or retain an inmate in segregation. Prisoners do not receive notice of the factors which will determine the actual length of their confinement to segregation cells.

The indeterminate nature of the sentences compounds these problems. The testimony of prison officials indicates that in addition to holding some inmates in segregation longer than the fixed part of their sentences (e. g., longer than 30 days of a "30 days or until" sentence), the bi-monthly Review Board often releases men before their term is served. In part, the bi-monthly Review Board functions as another sentencing tribunal. An inmate cannot be sentenced to an *additional* term in segregation based on conduct which occurred while he was in segregation unless he again receives a disciplinary board hearing accompanied by the due process protections outlined in *Wolff v. McDonnell, supra*; the Review Board can, however, keep him in segregation for a prolonged, indefinite amount of time for whatever reasons it has, or for no reason at all, so long as it perfunctorily reviews his case at sixty day intervals. In these circumstances—when the majority of sentences to punitive segregation are for an indeterminate period of time, when the Segregation Review Boards release some inmates from segregation long before their

term is served and confine others much longer than the fixed part of their sentences, when the review provided by the Boards is perfunctory at best, and when there is a total absence of objective criteria to guide the Boards in determining when to release prisoners from the segregation unit—the Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated.

■ The members of the plaintiff class, having established this due process violation, are entitled to relief. In light of the deficiencies of the review system outlined above, the injunctive relief sought by the class is appropriate. Accordingly, the Board of Corrections of the State of Alabama must promulgate guidelines concerning the operations of the Segregation Review Boards and make them available to prisoners confined in the segregation unit. Further, the Board of Corrections must publish a list of valid factors which the Segregation Review Boards must consider in deciding whether or not to release an inmate from punitive segregation. Also, the bi-monthly Segregation Review Board must provide a written notice of the reasons for its action to each prisoner denied release from segregation.

■ In addition to contesting the procedural inadequacies of the segregation review system, members of the plaintiff class urge that their rights to substantive due process have been violated. They allege that the actions of the Segregation Review Board in releasing and retaining inmates from the segregation unit are so arbitrary that they amount to a constitutional violation.

It is axiomatic that the Due Process Clause of the Fourteenth Amendment proscribes more than unfair procedures. It also protects individuals from arbitrary action by the government. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1956). Prisoners partake of that protection; their treatment

**6.** Minutes kept of the Board meetings reveal the hasty and superficial review afforded each inmate.

must be free from arbitrary and capricious actions of prison officials. *Pugh v. Locke, supra; Sostre v. McGinnis,* 442 F.2d 178, 198 (2d Cir. 1971) (en banc), *cert. denied sub nom. Oswald v. Sostre,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 and *sub nom. Oswald v. Sostre,* 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1971).

 The evidence in this case reveals innumerable examples of arbitrary action by the Segregation Review Board. Examples are set out in the margin.[7] In many instances inmates who had received segregation sentences of similar length were released by the Review Board after having served substantially different periods of time. In its examination of the records of the Board, the Court is unable to discover a rational explanation for such discrepancies. The general factors proffered by defend-

ants to justify the apparently disparate treatment, such as the inmate's past disciplinary record, the nature of the misconduct, and the length of sentence to segregation, often do not correlate with the release decisions made by the Board. While the Segregation Review Board is entitled to make rational distinctions in its evaluations of prisoners, it is impossible to do so in the absence of valid criteria to guide the deliberations of the Board members. This is yet another reason which makes it imperative that the Board of Corrections of the State of Alabama devise guidelines for the review process, including a list of factors to be considered by the Review Board members in evaluating whether an inmate should be released from or retained in the segregation unit.[8]

7. There are many examples of arbitrary treatment throughout the record. The Court specifically notes that these are not the only instances which support a finding of arbitrariness. These cases are cited as an illustration, not as an exhaustive catalogue.

One inmate served over 120 days in segregation for aiding and abetting the violation of institutional rules, while another was released after serving 33 days for the same offense. *See* Minutes of Segregation Review Board ["Minutes"] of June 13, 1978, at 13 and *Minutes* of March 6, 1978, at 14.

An inmate sentenced to six months in segregation for theft was released after 21 days while another sentenced to "30 days or until" for absence from work served more than 80 days. *See* Minutes of June 13, 1978, at 5 and Deposition of Charles Martin at 9.

An inmate sentenced to 6 months in segregation for possession of a knife was retained there more than 3 months; yet *another inmate* who was sentenced to segregation for possession of knife, fighting with a weapon, and stabbing an inmate was released after 2 months. *See* Minutes of March 6, 1978, at 8.

An inmate disciplined for fighting with a weapon was released after 2 weeks while one disciplined for fighting with a weapon and possessing a knife was released after 5½ months. *See* Minutes of March 6, 1978, at 6.

A prisoner *convicted of fighting with a weapon* was released after 5 weeks while another convicted of the same offense was retained after 10 weeks. *See* Minutes of March 6, 1978, at 12, 13.

One inmate *in segregation for possession of a* knife was released after 5 weeks while another there for the same violation was retained after 10 weeks. *See* Minutes of March 6, 1978, at

14. For same result, *see* Minutes of January 10, 1978, at 3.

A prisoner sentenced to segregation for possession of contraband ($550) was released after 30 days while another, in segregation for 2 counts of possession of contraband, was not released until 9 months later. *See Minutes of* March 6, 1978, at 14 and Minutes of June 13, 1978, at 10.

Although defendants argue that discrepancies can be explained by the past records of the individuals involved, there are many instances in which that is not so. For example, an inmate who had previously served two separate terms in segregation was released after serving 36 days for insubordination, despite the fact that the term for that offense is often a long one. *See* Minutes of June 13, 1978, at 9, 11. Similarly, one inmate was released after serving 11 days of a six month sentence, another prisoner was released after serving 13 days of a six month sentence despite the fact that he had been confined to segregation for a previous offense, and another with no past disciplinaries since his parole had been revoked served more than 80 days for being absent from his assigned work detail. *See* Minutes of June 13, 1978, at 14 and deposition of Charles Martin at 13.

8. While the Court finds that there is a pattern of arbitrary action by the bi-monthly Segregation Review Board in its decisions to release or retain inmates, the Court does not find that plaintiff McCray was retained in segregation without cause. McCray entered the Alabama penal system in 1964 to serve a sentence of life, plus ten years. Prior to his release on parole in 1976, he had been disciplined more than twenty times for infractions of prison rules. He was confined to segregation continuously from 1969

*Equal Protection Claim*

■ The plaintiff class contends that the defendants follow a racially discriminatory policy in confining prisoners to and retaining them in segregation. The Court concludes that the practices of the defendants violate the Constitution. Without question, the central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct which discriminates on the basis of race. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). All persons, including prisoners, are protected by the Equal Protection Clause. *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966), *aff'd per curiam,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968).

■ Historically, the penal facilities of the State of Alabama were racially segregated. This continued to be the official policy until a three-judge court ordered the complete desegregation of the state prisons. *Washington v. Lee, supra,* at 333. In 1976 it was determined that a pattern of racially discriminatory practices still existed at the Alabama penal institutions, and the prison officials were ordered to institute immediately an affirmative hiring program designed to reduce the racial disparity between the staff and the inmate population. *Pugh v. Locke, supra,* at 325, 335.

The evidence in this case demonstrates that racial discrimination is still a problem in the Alabama prisons. The population of the prison system is 60.7% black. The correctional staff is approximately 14% black. The population of the segregation unit during the past year has averaged 68.7% black.[9] Further, the uncontradicted evidence is that 92 of the 95 inmates sentenced to segregation for insubordination—the offense which is most often punished by a stiff sentence—and reviewed by the Segregation Review Board last year were black. Blacks are also greatly overrepresented in the segregation unit for some other offenses which by their nature involve a large amount of subjective judgment by the guards, such as the charge of aiding and abetting violations of institutional rules.[10]

The Supreme Court has stated that an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact of disparate impact. *Washington v. Davis, supra,* 426 U.S., at 242, 96 S.Ct. 2040. In particular, in

9. The Minutes of the Segregation Review Board contain the following information about the population of the segregation unit.

| Date of Review | Black | White | Percent Black |
| --- | --- | --- | --- |
| August 4, 1977 | 63 | 26 | 70% |
| September 29, 1977 | 82 | 29 | 73.8% |
| November 17, 1977 | 59 | 22 | 72.8% |
| January 10, 1978 | 78 | 31 | 71.6% |
| March 6, 1978 | 75 | 41 | 64% |

| Date of Review | Black | White | Percent Black |
| --- | --- | --- | --- |
| April 26, 1978 | 63 | 40 | 61% |
| June 13, 1978 | 72 | 36 | 66% |

to 1975. He was paroled in 1976; his parole was revoked in 1977. On August 26, 1977, a disciplinary board convicted him of refusing to work. On November 9, 1977, a prison disciplinary board found him guilty of assaulting two officers, and sentenced him to segregation. In his testimony plaintiff admitted that he had often told the Segregation Review Board that he did not want to be released from segregation if he had to perform his regular work assignments. McCray has since been released from segregation.

10. The evidence in this case demonstrates the need for a meaningful affirmative hiring program. The overwhelmingly disproportionate number of blacks confined for insubordination is a not unexpected result when a predominantly black prison population is guarded by a predominantly white force. It is also noteworthy that in each month for which statistics were provided blacks were overrepresented in the segregation unit. While the numbers fluctuated from review to review, there was not one instance in which the percentage of blacks in segregation was equal to or less than the percentage of blacks in the overall prison population. Statistically speaking, this consistent overrepresentation presents a less egregious situation than the insubordination sentences; nonetheless, it is another troubling indicator that the defendants have failed to act to reduce the great racial disparity between the inmates and the staff.

problems of racial discrimination "statistics often tell much, and Courts listen." *State of Alabama v. United States,* 304 F.2d 583, 586 (5th Cir. 1962). Once the evidence—including the historical background and the statistical data—establishes a prima facie case of discriminatory purpose, the burden of proof shifts to the defendants to rebut the charge. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 267, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis, supra,* 426 U.S., at 241, 96 S.Ct. 2040; *Williams v. DeKalb County,* 582 F.2d 2 (5th Cir. 1978). In the instant suit, viewing all the surrounding circumstances in light of these principles, the Court finds that the pattern of actions taken by the defendants with respect to inmates confined in punitive segregation reflects a racially discriminatory purpose. Furthermore, the record reveals that the defendants have been completely unable to furnish a nondiscriminatory explanation. Thus, the evidence produced by the members of the plaintiff class stands unrebutted, and the defendants have failed to carry their burden of showing that their actions were not racially motivated. Accordingly, judgment will be entered for the members of the plaintiff class on their claim that the Equal Protection Clause of the Fourteenth Amendment has been violated.

### Access to the Courts Claim

Plaintiff McCray alleges that he and other members of the class have been confined to and retained in segregation in retaliation for the lawsuits they have filed while incarcerated. Such a claim, if true, is a serious violation of the law. As the Supreme Court recently stated, "It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). Correctional officials may not obstruct or unreasonably restrict prisoners in their efforts to obtain judicial relief. *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21

L.Ed.2d 718 (1969). Sentencing "jail-house lawyers" to disciplinary confinement for assisting other inmates to file complaints in court is unlawful. *Id.* So, too, is action taken to intimidate prisoners from initiating legal action. *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Christman v. Skinner,* 468 F.2d 723 (2d Cir. 1972).

The evidence in this case, however, falls short of the required showing that inmates are confined and retained in segregation because they are "writ-writers." As detailed earlier, plaintiff McCray was sentenced to segregation for assaulting two guards.[11] He admitted he had told the Segregation Review Board that he did not want to be released from segregation if he had to work. Moreover, Dudley Golden, the other inmate who allegedly has been punished for "writ-writing," testified that he was sentenced to segregation for missing work detail and refusing to work. Further, he stated that he was not yet willing to go back to work. The Court finds that the plaintiffs have failed to prove that defendants have harassed or otherwise unreasonably restricted prisoners for pursuing judicial relief.

### Conclusion

The evidence presented in this case demonstrates that inmates in the Alabama penal system are retained in punitive segregation in violation of the Fourteenth Amendment. The Segregation Review Board has great power over the conditions of confinement of individual prisoners, yet it acts in a summary manner, according to vague criteria, without ever explaining the reasons for its actions. In addition to its procedural deficiencies, it has been shown to act arbitrarily and capriciously. These actions constitute a serious violation of plaintiffs' rights to due process of law.

The evidence also demonstrates that black prisoners suffer from racial discrimination in their confinement to and retention

---

11. *See* n. 7, *supra.*

in punitive segregation. This constitutes an impermissible violation of their right to equal protection of the laws.

Defendants must change the system of reviewing prisoners in the segregation unit so that it can fulfill its proper function without offending the Constitution. The Court has indicated the general relief demanded by this situation, and will require the defendants to fashion a detailed plan to correct deficiencies discussed in this memorandum.