# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-2465/10-2712

_____

| | |
|---|---|
| David Williams, | * |
| | * |
| Plaintiff - Appellee/ | * |
| Cross-Appellant, | * |
| | * |
| v. | * |
| | * |
| Ray Hobbs, Chief Deputy Director, | * |
| Arkansas Department of Correction, | * |
| | * Appeals from the United States |
| Defendant, | * District Court for the |
| | * Eastern District of Arkansas. |
| Greg Harmon, Warden, East Arkansas | * |
| Regional Unit, ADC; Marvin Evans, | * |
| Jr., Warden, Tucker Unit, ADC; | * |
| Grant Harris, Warden, Varner Unit, | * |
| ADC; Tommy James, Jr., Assistant | * |
| Warden, Maximum Security Unit, | * |
| ADC; Tim Moncrief, Assistant Warden, | * |
| Varner Unit, ADC, | * |
| | * |
| Defendants - Appellants/ | * |
| Cross-Appellees. | * |

_____

Submitted: March 29, 2011
Filed: December 2, 2011(Corrected: 01/18/2012)

_____

Before LOKEN, SMITH, and GRUENDER, Circuit Judges.

_____

SMITH, Circuit Judge.

David Williams, an inmate in the Arkansas Department of Correction (ADC), filed the instant lawsuit pursuant to 42 U.S.C. § 1983, alleging, *inter alia*, that his approximately 14-year detention in administrative segregation ("Ad. Seg.")[1] violated his procedural due-process rights under the Fourteenth Amendment to the U.S. Constitution because the periodic reviews of his detention were not meaningful. We previously reversed the district court's grant of summary judgment against Williams, concluding that Williams had asserted a constitutionally protected liberty interest. *Williams v. Norris*, 277 F. App'x 647, 648–50 (8th Cir. 2008) (unpublished per curiam). We further concluded that ADC's written Ad. Seg. review policies accorded Williams all the process that he was constitutionally due, but we remanded the case for a fact determination of whether the defendants—five prison officials—conducted Williams's review hearings in a meaningful manner. The district court held a bench trial on the matter and found that four of the five defendants had in fact denied Williams due process by conducting meaningless Ad. Seg. review hearings. Consequently, the district court awarded Williams $4,846 in nominal damages—$1 for every day that Williams lived in Ad. Seg.—but denied Williams's prayer for punitive damages. Presently, the defendants appeal the district court's findings that they conducted meaningless Ad. Seg. review hearings and its nominal-damages computation. Williams cross-appeals, urging that the district court erred in failing to find the fifth defendant liable and in denying Williams compensatory and punitive

---

[1]The record reflects that, while in Ad. Seg., an ADC inmate is confined in isolation for 23 hours of the day and, depending on one's classification, in a cell with a solid door that lacks any window through which the inmate can view passers by. ADC allots an Ad. Seg. inmate one hour per day to exercise outside in a cage located in the prison yard. Additionally, as the magistrate judge summarized in his findings of fact, "[w]hile an inmate is housed in [Ad. Seg.], he/she is housed in a separate area of the institution and receives mail/television/radio privileges. Meals are routinely served in the cells and inmates are provided shower opportunities no less than three times per week." *Williams v. Norris*, 721 F. Supp. 2d. 824, 828 (E.D. Ark. 2010).

damages. For the reasons that follow, we reverse and remand the district court's nominal-damages award as improperly computed. We affirm the remainder of the district court's disposition.

I. *Background*

A. *Williams's Institutional History with ADC*

In 1981, Williams began serving a life sentence without the possibility of parole following his conviction for murder. In 1982, just one year after commencing his prison sentence, Williams was convicted of murdering a fellow inmate and thereafter served 30 days in punitive segregation and one and one-half years in Ad. Seg. Subsequently, in July 1983, the ADC released Williams into the general population at the Tucker Maximum Security Unit ("Tucker Max"), where he continued serving his life sentence without major incident until 1995. In December 1995, a fellow inmate attacked and injured Williams while Williams was performing his assigned duties in Tucker Max's kitchen. Prison officials believed that this attack stemmed from Williams's suspected drug "trafficking and trading" activities at Tucker Max, and that the altercation may even have resulted from a "drug deal gone bad."

In December 1995, immediately following this attack, ADC officials placed Williams in Ad. Seg.—ostensibly for his *own* protection—where he ultimately remained continuously, and without interruption, for nearly 14 years until March 13, 2009.[2] In contrast, Williams's attacker served only 56 days in Ad Seg.

_____

[2]In the first appeal in this matter, this court recognized that Williams's three-year sojourn in Utah—where he also resided in Ad. Seg.—is attributable to ADC for Due Process purposes. *See Williams*, 277 F. App'x at 648 n.1 (noting, parenthetically, that "separate segregation sentences should be aggregated for purposes of due process inquiry when they constitute sustained period of confinement" (citing *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001))).

B. *Overview of ADC's Ad. Seg. Policy*

Throughout Williams's time in Ad. Seg., ADC maintained essentially the same written policy on the administration of Ad. Seg. and uniformly provided that

> [t]he Institutional Classification Committee . . . may place an inmate in administrative segregation if his/her continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates. Also, inmates who threaten the security or orderly running of the institution may be segregated.

ADC's Ad. Seg. policies mandated that Williams be afforded: (1) a hearing before the Classification Committee; (2) notice of that hearing at least 24 hours prior thereto; and (3) an opportunity to appear at the hearing and make any statement desired and present documentary evidence, including witness statements. At the conclusion of these proceedings, the Classification Committee recommends by majority vote whether an inmate should be placed (or, if applicable, remain) in Ad. Seg. The inmate must "be advised of the reasons of his/her administrative segregation in writing and a copy of the reasons will be maintained in the inmate's institutional file. All decisions may be subject to review and approval or disapproval by the Warden or his/her designee." Additionally, the Classification Committee must review the status of an inmate confined in Ad. Seg. every 30 days. The Classification Committee is routinely composed of the warden, assistant warden, chief of security, a member of mental health, and a "classification officer." The warden, however, possesses complete authority to approve or deny the Classification Committee's recommendation. Also, Mental Health staff must independently review the inmate's status every 30 days. Finally, ADC's Ad. Seg. policies provide as follows:

> No inmate shall remain in a segregation classification for more than one year unless he has been personally interviewed by the Warden at the end of one year and such action is approved by him. At the end of the second and each additional year that an inmate remains in a segregation

classification, he must be personally interviewed by both the Warden and the Deputy/Assistant Director, who will then determine whether or not continuation in that status is necessary and/or appropriate.

## C. *The Instant Lawsuit*

On February 16, 2005, Williams filed the instant lawsuit pro se in the United States District Court for the Eastern District of Arkansas. Williams alleged that his continued confinement in Ad. Seg. violated his constitutional rights under the Fourteenth Amendment's Due Process and Equal Protection Clauses. Williams sued pursuant to 42 U.S.C. § 1983 and sought equitable relief as well as monetary damages. On August 22, 2006, the district court granted the defendants' motion for summary judgment, but, on appeal, this court affirmed in part and reversed in part that decision. *Williams*, 277 F. App'x at 650. Specifically, we affirmed the district court's conclusion that Williams was not denied his rights under the Fourteenth Amendment's Equal Protection Clause because "Williams made no showing that parole-eligible inmates, death-row inmates, or other categories of inmates were treated differently, despite being similarly situated, in a manner that bore no rational relation to any legitimate penologicial interest." *Id.* at 650. Nevertheless, we concluded that Williams's 13-year confinement in Ad. Seg. "constitutes an atypical and significant hardship, . . . and thus he had a liberty interest protected by the Due Process Clause." *Id.* at 648 (citing *Sandin v. Conner*, 515 U.S. 472, 483–87 (1995)). Proceeding from this initial step in the two-step due-process inquiry, this court explained that,

> [o]nce a liberty interest is established, the next question is what process is due. We conclude that, for an [A]d[.] [S]eg[.] inmate, the Constitution requires no more than the process Williams received—reviews at 60-day intervals at which Williams could make statements and present evidence, and annual meetings with a warden—*provided such reviews were meaningful*.

We conclude, however, that *there remains an unresolved fact issue* on this record as to whether Williams actually received meaningful reviews, rather than sham reviews, as he contends.

*Id.* at 649 (emphases added) (internal citations omitted).

Accordingly, we remanded Williams's case for further proceedings consistent with our opinion. Consequently, on April 6, 2009, the magistrate judge commenced a bench trial, but after receiving only three witnesses, "held the case in abeyance for the purposes of appointing counsel to represent [Williams], and to address the issue of the absence of one of [Williams]'s requested witnesses." *Williams*, 721 F. Supp. 2d at 828. Subsequently, on April 29, 2009, the district court appointed counsel to represent Williams, and the magistrate judge conducted a three-day bench trial on February 2–4, 2010.

Following the bench trial and court-ordered post-trial briefing, the magistrate judge issued its "Proposed Findings and Recommendations," finding therein "that the reviews conducted under the auspices of these defendants were not 'meaningful' and therefore, that [Williams]'s due process rights were violated by his continued incarceration in [Ad. Seg.] from 1999-2009."[3] *Id.* at 841. Based on the magistrate Judge's analysis, the only defendant immune from liability is Defendant Chief Deputy Director Ray Hobbs ("Dir. Hobbs"). The magistrate judge "f[ound] that his participation in five director's reviews over the course of plaintiff's stay in [Ad. Seg.] was not sufficient to impose liability in this matter." *Id.* Finally, with respect to damages, the magistrate judge found: (1) that Williams was not entitled to compensatory monetary damages because he failed to show any physical injury that resulted from his time in Ad. Seg., a showing that the Prison Litigation Reform Act

---

[3]As already noted, Williams's 1996–1999 tenure in Utah—where he was also confined in Ad. Seg.—is attributable to the defendants for due-process purposes. *See supra* n.2.

-6-

(PLRA) sets as a prerequisite for the recovery of compensatory money damages, *id.* at 841; (2) that, in the absence of actual damage, Williams was entitled to nominal damages of $4,846.00, calculated at $1.00 for every day that, according to Williams's trial testimony, he was confined in Ad. Seg., *id.* at 841–42; and (3) that Williams was not entitled to punitive damages because the magistrate judge "d[id] not find that the defendants' decisions to keep plaintiff in [Ad. Seg.] were motivated by evil intent, or reckless or callous indifference to plaintiff's rights," *id.* at 842.

The district court adopted the magistrate judge's recommendations, limiting its discussion to the magistrate judge's nominal-damages calculation. Specifically, the district court stated as follows:

> Citing this Court's determination of nominal damages in *Fegans v. Norris*, 4:03CV00172 (August 25, 2006) and the Eighth Circuit's opinion affirming the award, Judge Jones recommended that the Court award Williams nominal damages in the form of $1 per day of his [Ad. Seg.] status. *While the law is not entirely clear as to whether nominal damages of $1 per violation or $1 total is the correct calculation of nominal damages in prisoner cases*, the Court again adopts the view that nominal damages may be based on a per violation basis. *See Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004).

*Id.* at 826 (emphasis added).

## II. *Discussion*

Defendants appeal the district court's liability finding as well as its nominal-damages award. Williams cross-appeals the district court's finding of no liability as to Hobbs and also its denial of compensatory and punitive damages.

### A. *Williams's Due Process Claim*

In their first point on appeal, Warden Gregory D. Harmon ("Warden Harmon"), Assistant Warden James ("Ass't Warden James"), Warden Grant Harris ("Warden Harris"), and Assistant Warden Tim Moncrief ("Ass't Warden Moncrief") urge that the district court clearly erred in finding their administration of Williams's Ad. Seg. review process was not meaningful such that it denied Williams due process. In response, Williams counters that the district court did not err in assigning them liability, and that, moreover, the district court should have found Dir. Hobbs liable as well. We hold that the district court did not clearly err in its factual findings as to the meaningfulness of Williams's Ad. Seg. reviews and, accordingly, we will affirm that portion of the district court's decision.

### 1. *Overview of Due Process's Requirements in the Ad. Seg. Context*

In the Ad. Seg. context, the determination of whether prison officials have denied an inmate due process involves a two-step inquiry. Specifically, "'[the plaintiff] must first demonstrate that he was deprived of life, liberty, or property by government action.'" *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (per curiam) (alteration in original) (quoting *Phillips v. Norris*, 320 F.3d 844, 846 (8th Cir. 2003)). "To prevail on such a claim based on prison housing, an inmate must show that the segregation created an 'atypical and significant hardship on him in relation to the ordinary incidents of prison life' to demonstrate that his liberty interest was curtailed." *Rahman X v. Morgan*, 300 F.3d 970, 973 (8th Cir. 2002) (alteration omitted) (quoting *Sandin*, 515 U.S. at 484). "Having determined that a liberty interest does in fact exist in this case, we must next determine what process is necessary to protect that interest." *Clark v. Brewer*, 776 F.2d 226, 232 (8th Cir. 1985).

On remand, the district court addressed "an unresolved *fact issue* . . .whether Williams actually received *meaningful* reviews, rather than sham reviews, as he contends." *Williams*, 277 F. App'x at 649 (emphasis added). Accordingly, on remand,

the trial evidence focused on whether Williams's 60-day Ad. Seg. reviews before the Classification Committee were meaningful.

Whether a given process is meaningful for the purposes of the Due Process Clause is a question of fact that we only reverse if clearly erroneous. *See Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975)[4] ("The district court found ultimately that the review procedures . . . had not been meaningful and did not satisfy the requirements of due process of law. That *finding* has substantial evidentiary support in the record, *and we cannot say that it was clearly erroneous*." (emphases added)). On appeal from a bench trial, we may reverse the district court's findings as to meaningfulness only if we conclude that the district court clearly erred. *Franklin v. Local 2 of the Sheet Metal Workers Int'l Ass'n*, 565 F.3d 508, 516 (8th Cir. 2009). Of course, we review de novo the district court's legal conclusions. *Id.*

### 2. *Williams's Ad. Seg. Reviews*

We will review the evidence as it pertains to each defendant's individual liability.

### a. *Warden Harmon*

Warden Harmon supervised Williams's Ad. Seg. confinement at Tucker Max from June 1999 until October 2002, when Warden Evans replaced him, and again, from June 2006 to January 2008 at the East Arkansas Regional Unit (EARU). Warden Harmon testified that, as part of his duties at both Units, he served on Williams

---

[4]The dissent contends that "[t]he court errs in its uncritical reliance on *Kelly* . . . a panel decision substantially undermined, if not overruled, by later Supreme Court decisions." Nowhere in the defendants' briefs do they allege that the Supreme Court overruled *Kelly* in its later decisions, nor do we find that this court or the Supreme Court has done so. We also note this court's reliance on *Kelly* in its previous reversal of the district court's grant of summary judgment against Williams. *Williams*, 277 F. App'x at 649, 650.

Classification Committee and retained final authority to approve or disapprove any committee recommendation, a power that he routinely exercised. Warden Harmon testified that he read ADC's Ad. Seg. Review policies and procedures and "tried to apply it to the best of [his] ability," characterizing it as "self-explanatory."

In June 1999, upon Williams's arrival at Tucker Max from his three-year stint in Utah, Williams was immediately placed in Ad. Seg. as a continuation of his Utah housing status and pending the Classification Committee's formal determination. Later that month, the Classification Committee voted that Williams remain in Ad. Seg., checking a preprinted box on the Ad. Seg. Review Form which indicated that Williams was a "threat to the security and good order of the institution." In the portion of the Ad. Seg. Review Form reserved for a Committee-generated "Factual Basis for Decision," the Classification Committee added in handwriting that an assignment to Ad. Seg. was required "at this time for [illegible] own safety." In September 1999, at Williams's next 60-day review, the Classification Committee once again voted to retain Williams in Ad. Seg., this time stating no written reason for the retention. Notably, at this review, the Classification Committee did not use the ADC-promulgated Ad. Seg. Review Form, opting instead for a Form 33 or "cut slip,"[5] a yellow slip about the size of a half-sheet of looseleaf paper with limited space for any Committee commentary and no space for any commentary Williams might have. Per standard practice, the Classification Committee did not transmit a copy of this Form 33 to Williams.

---

[5]The trial transcript reveals some initial confusion as to what function these Form 33s, or "cut slips," served. Eventually, Warden Harmon and others clarified that the Form 33s contain no specific details concerning the basis for the Committee's decision to retain an inmate in Ad. Seg. and that they are not sent to inmates but instead are inserted directly into inmates' institutional jackets, presumably leaving inmates with no notice of their existence. Notably, a Form 33 does not even disclose the Classification Committee's composition and, thus, how each member voted.

On October 27, 1999, at Williams's next 60-day review, the Classification Committee split down the middle, with two of its members voting for Williams to remain in Ad. Seg., and two of its members, the Mental Health specialist and Classification Officer, voting for Williams's release into general population. Warden Harmon exercised his authority to cast the deciding vote that Williams remain in Ad. Seg., once again citing that Williams posed "a threat to the security and good order of the institution." At trial, Warden Harmon testified that he made this decision based on the totality of the circumstances and Williams's entire institutional jacket and history, specifically citing Williams's conviction for murdering a fellow inmate in 1982 and his past drug-dealing activities. Warden Harmon conceded that the only evidence that he or the Classification Committee had about Williams's day-to-day dealings up to that point had been positive but stressed nevertheless that he did not restrict his examination of Williams to Williams's recent clean history. Instead, Warden Harmon testified that he "looked at his whole history, his institutional file," and attached special significance to a letter from prison official George Brewer labeling Williams as a known drug trafficker and trader, despite the fact that Williams's only disciplinaries related to drugs did not involve drug trafficking, but only possession.

Warden Harmon later admitted at trial that neither he nor any Classification Committee member ever indicated in any Ad. Seg. Review form that Williams was a suspected drug dealer. Indeed, Warden Harmon testified at trial that neither he nor any Classification Committee member ever explained why Williams continued to pose a threat to the security and good order of the institution. Moreover, Warden Harmon contended that, as a correctional professional, he had to rely on any intelligence he received concerning Williams's drug activities, verified or not. When questioned about Williams seven years of clean ADC history before a particular review by Warden Harmon, Harmon reiterated his prior deposition testimony that attributed Williams's years of incident-free conduct to his isolation from the general

population. In Warden Harmon's words, "[s]even years of clean history is irrelevant to your determination [of] whether somebody poses a threat to [the] security and good order of the institution."

Finally, despite asserting throughout trial that he and the Classification Committee relied heavily on Williams's entire institutional jacket when determining whether to retain Williams in Ad. Seg., Warden Harmon conceded that "in [his] 32 years, [it has] never been the practice of anybody, to review a jacket before the classification hearing," but only during. Notably, other witnesses testified that Williams's institutional jacket was voluminous and that the Classification Committee hearings typically lasted only "four or five" minutes. Moreover, Warden Harmon admitted that, despite there being five members on a Classification Committee present at Williams's Ad. Seg. hearings, only he possessed the institutional jacket during the hearing, but he maintained that the institutional jacket was available for any Committee member's review during that time should they request it. Still, Ruby Evans, a former Classification Committee member and Classification Officer at Varner Supermax, conceded at trial that she *never* looked at Williams's jacket at any time, during a hearing or otherwise. Similarly, Warden Harmon admitted that he never requested to review Williams's mental health file, which he conceded is kept separate from Williams's institutional jacket.

### b. *Ass't Warden Moncrief*

Ass't Warden Moncrief served as the assistant warden at Varner Supermax from September 2003 until June 2006. Ass't Warden Moncrief's duties included participating in the Classification Committee hearings and, in Warden Harris's absence, serving as the warden's designee charged with approving or disapproving the Classification Committee's recommendation. Most notably, on March 9, 2004, Ass't Warden Moncrief fulfilled this role as Warden Harris's designee and vetoed the Classification Committee's recommendation that Williams be released out of Ad. Seg.

into the general prison population. Ass't Warden Moncrief checked the box on the Ad. Seg. Review Form indicating that Williams posed "a threat to the security and good order of the institution." After this March 9, 2004 veto, the Classification Committee voted consistently that Williams remain in Ad. Seg. through Moncrief's departure from ADC in 2005.

Much like Warden Harmon, Ass't Warden Moncrief confirmed that, under his supervision, the Classification Committee typically did not expound on its reasons for keeping Williams in Ad. Seg., opting instead to simply check the box on the Ad. Seg. Review Form labeled "threat to the security and good order of the institution." Moreover, the Classification Committee declined to explain what evidence of Williams demeanor or behavior supported this conclusion. Additionally, Ass't Warden Moncrief conceded that, on March 9, 2004, when he vetoed the Classification Committee's recommendation, he didn't review Williams's institutional jacket and likely would not do so during a routine 60-day Classification Committee meeting. Ass't Warden Moncrief believed that, "in most cases," "once a threat to security is always a threat to security." However, Ass't Warden Moncrief admitted that Williams had always been polite and neither volatile nor violent towards him but declared that, even if Williams had "been the perfect model citizen" or "model prisoner," he would still vote to keep Williams in Ad. Seg. Finally, in the presence of the very Classification Committee that he supervised and over which he wielded veto power, Ass't Warden Moncrief told Williams that as long as he was the assistant warden, his vote—in most cases, the dispositive one—would be for Williams to remain in Ad. Seg.

### c. *Ass't Warden James*

Ass't Warden James was the assistant warden at Tucker Max from June 2001 until February 2007, and part of his duties included conducting Classification Committee hearings. Specifically, Ass't Warden James participated in four

Classification Committee hearings throughout 2001 and 2002, voting to retain Williams in Ad. Seg. each time. As the reason for not voting to release Williams, Ass't Warden James testified at trial that, "[a]fter review of all the factors, it just—you know, based on–in 2001, I would have had—what 16 years worth of experience. Based on my correctional experience, it did not seem to be a prudent thing to do." Additionally, Ass't Warden James testified that he suspected that Williams was the "kingpin" behind a majority of the contraband that moved through Ad. Seg. as well as general population, though he admitted that this was speculation. Finally, Ass't Warden James asserted that he feared for Williams's safety because of the 1995 attack he suffered at the hands of another inmate, but Ass't Warden James conceded that the inmate's identity, location, or release condition was unknown.

### d. *Warden Evans*

From October 2002 until September 2003, Warden Evans was the warden of Tucker Max while Williams was housed there. Warden Evans testified that he did not specifically recall presiding over Classification Committee hearings involving Williams, but his signature appears on many hearing forms. These hearings occurred on October 23, 2002, February 26, 2003, March 26, 2003, April, 24, 2003, May 21, 2003, June 25, 2003, and July 30, 2003. During those hearings, the committee recommended that Williams remain in Ad. Seg., usually for the stated reason that Williams continued to be a threat to the good order and security of the institution. Still, on a couple of occasions, the Classification Committee checked the box on the Ad. Seg. Review Form indicating that Williams demonstrated a "chronic inability" to adjust to general population. At trial, Warden Evans admitted that these isolated instances in which the Classification Committee checked the "chronic inability" box constituted clerical errors because Williams had no occasion to exhibit a chronic inability to adjust to general population given that he had never been released into general population. As the district court observed in its Findings of Facts and Conclusions of Law, Warden Evans "testified to no single incident or fact that came

-14-

into play in his decisions to continue Williams in Ad. Seg." and simply averred that "the decisions were based on the totality of information available to him at the time." *Williams*, 721 F. Supp. 2d at 832. Indeed, as Warden Evans testified,

> I am not aware of a single incident or fact that I would be willing to testify in this court today that I made to continue him on segregation. I will say in this court today that the decisions that I made were based on the information that was available to me at the time, the totality of the information, not just that day or that particular time.

Warden Evans maintained at one point in his testimony that, "[a]t sometime in the past, I am absolutely certain that I have looked at Inmate Williams'[s] record. I cannot tell you today when that happened or under what circumstances. . . . Or how much of it I looked at. I can't tell you that today." Still, at other points in his trial testimony, Warden Evans conceded that he never reviewed Williams's institutional jacket.

### e. *Warden Harris*

Warden Harris has been the warden at Varner Supermax since February 2004. Williams was incarcerated there from February 2004 until June 2006 and from January 2008 until the present. Warden Harris was absent from the Classification Committee hearing in March 2004, when Ass't Warden Moncrief overruled the committee's recommendation to release Williams into general population. Moreover, at trial, Warden Harris stated he was not even aware of Ass't Warden Moncrief's veto until after April 2006. Warden Harris attributed his ignorance to arriving at Varner less than a month prior to the March 2004 hearing. Still, Warden Harris conceded that he could have learned of the matter at any time had he reviewed the Classification Committee's Ad. Seg. Review Form. Warden Harris participated in the committee hearings on June 16, 2004, August 19, 2004, and October 21, 2004, when the recommendations were to keep Williams in Ad. Seg. as a threat to the security and good order of the institution. At trial, Warden Harris conceded that the only negative

-15-

information about Williams that he ever received was from Ass't Warden Moncrief, who reminded him that Williams had been convicted for murdering a fellow inmate at the Cummins Unit some 18 years prior. Nevertheless, Warden Harris asserted that Williams's record of eight years' clean history likely was attributable to his extended stay in Ad. Seg.

At the January 2005 Classification Committee hearing, which Warden Harris attended, the Classification Committee (including Warden Harris) voted to deny Williams's request for release to general population, offering no written reason. Warden Harris was also present at the Classification Committee's hearings in March 2005 and April 2006, when Williams's request was again denied. On both occasions, the Classification Committee checked the box on the Ad. Seg. Review Form, which indicated that Williams remained a threat to the security and good order of the institution. However, in June 2006, the Classification Committee recommended that Williams be released upon transfer. Warden Harris testified at trial that this meant that if ADC transferred Williams to another unit, that unit would have the option to release him to the general population. Nevertheless, when ADC transferred Williams to EARU soon thereafter, EARU placed Williams in its own Ad. Seg., where he remained for the duration of his stay there.

Williams returned to Varner in January 2008, and, according to Warden Harris, was assigned to Ad. Seg. due to his past history, although Warden Harris conceded that, to his knowledge, Williams had maintained a clean disciplinary record while at EARU. On February 20, 2008, Warden Harris signed off on a subordinate's proposal to assign Williams to work in the laundry as part of a "step-down" program, whereby he would work in the Unit during the day and be locked down at night. Williams performed acceptably in this "step-down" program, but the Classification Committee continued to recommend that he remain in Ad. Seg., in March 2008, April 2008, July 2008, and December 2008. Warden Harris was absent from the July 2008 meeting,

-16-

where the Classification Committee noted that Williams had been on special assignment for 120 days and recommended that Williams be referred to general population. Warden Harris averred at trial that he rejected this recommendation but conceded that there is no Ad. Seg. Review Form or other type of document reflecting this decision. Moreover, Warden Harris admitted that he cannot recall communicating it to Williams, though he was sure that he would have. In February 2009, the committee voted for Williams to remain on Ad. Seg. but that he would be reviewed for release from Ad. Seg. in March. Warden Harris was not present at that meeting. He was present in March 2009, however, when the committee approved Williams's release into general population. Warden Harris maintained at trial that he did not vote for Williams's release from Ad. Seg. prior to that date because, after considering the totality of Williams's behavior while incarcerated, he was not confident that Williams was ready for general population. Furthermore, Warden Harris asserted that the absence of documentation does not mean an absence of legitimate concerns or legitimate investigations. Finally, Warden Harris continues to be concerned that Williams is "walking a fine line."

### f. *Dir. Hobbs*

Presently, Dir. Hobbs is the acting director of the ADC, effective January 1, 2010. Prior thereto, Dir. Hobbs was chief deputy director for over five years. Pursuant to the ADC Ad. Seg. policy, Williams was entitled to an annual review by the deputy director after two years of Ad. Seg. detention. In September 2002, Williams filed a grievance complaining that he had not received a director's review despite having been in Ad. Seg. since June 1999. Dir. Hobbs denied Williams's grievance, informing Williams that he was in error and that he had received all the director reviews to which he was entitled. However, at trial, Dir. Hobbs testified that his response was incorrect because it was premised on his own misbelief that a deputy director had reviewed Williams in October 2001. On November 18, 2005, after Dir. Hobbs learned of the error, he emailed his staff, instructing them to "review all ad seg inmates at

your unit to ensure that no inmate is overlooked for his or her annual director's review per policy."

Williams's first director's review was conducted on December 30, 2002, after which Dir. Hobbs concurred in the committee's decision to retain Williams in Ad. Seg. because he posed a threat to security. Williams's next director's review was not conducted until April 2005. Following this review, Hobbs voted for Williams to remain in Ad. Seg. In April 2006, Dir. Hobbs again met with Williams and the Classification Committee, at which time he noted his desire to review Williams's status in 60 days. Dir. Hobbs testified at trial that he could not recall why he wished to visit with Williams again in 60 days. The subsequent meeting never occurred. The next two director's reviews were held in December 2007 and February 2009, at which the committee voted to retain Williams in Ad Seg. Dir. Hobbs was absent from the March 2009 meeting, which resulted in Williams's release into general population, but Warden Harris contacted him to solicit his approval of the release. Dir. Hobbs testified that, at some point, he conversed with the unit psychiatrist, Dr. Kelly, who told him plaintiff was calculating and could strike at any time. Still, Dir. Hobbs testified that Williams's behavior improved during the "step-down" program. Finally, Dir. Hobbs testified that when he reviewed Williams's status during the annual reviews, he took into consideration Williams's institutional file, his adjustment, job assignments, comments from supervisors, and everything in Williams's file.

### 3. *Meaningfulness of Williams's Ad. Seg. Reviews*

After review of this record, we conclude that the district court did not clearly err in finding that Williams's Ad. Seg. reviews, as administered by Warden Harmon, Ass't Warden Moncrief, Ass't Warden James, Warden Evans, and Warden Harris, were not meaningful as the Due Process Clause requires.

Our decision in *Kelly* is the most apposite circuit precedent discussing the Due Process meaningfulness of Ad. Seg. reviews. In that case, we reviewed the Iowa State Penitentiary's decision to administratively segregate two inmates—one who stabbed (non-fatally) a prison guard and another who murdered a prison guard. 525 F.2d at 396. In *Kelly*, we were "concerned . . . ultimately with the constitutionality of the continued confinement of the plaintiffs as individuals in indefinite administrative segregation after their respective convictions in the state courts." *Id.* at 399. The *Kelly* court "recognize[d] at the outset . . . that it is not the function of federal courts to embroil themselves unduly in matters of prison administration or of the classification of convicts or prison security." *Id.* Rather, "[i]n those areas much must be left to the discretion of prison administrators, and in a given case a federal court should go no further than constitutional necessities require." *Id.* This squarely comports with the Supreme Court's subsequent admonitions that "'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators.'" *Hewitt v. Helms*, 459 U.S. 460, 474 (1983), *abrogated on other grounds by Sandin*, 515 U.S. at 483 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 n.14 (1981)).

Notably, *Kelly* distinguished between "punitive" and "administrative" segregation, noting that the latter "is not punitive" as it "*looks to the present and the future* rather than to the past." *Kelly*, 525 F.2d at 399 (emphasis added). Accordingly, Ad. Seg. "involves the exercise of administrative judgment in determining whether an inmate should be segregated from the general population and predicting what he will probably do or have done to him if he is permitted to remain in population or to return to population after a period of segregation." *Id.* at 399–400. In making this administrative judgment, "the ultimate decision in a given case must be left to the informed judgment, *including discretionary judgment*, of prison administrators, subject to review by their own superiors and ultimately by the courts in proper cases." *Id.* at 400 (emphasis added).

Speaking further, *Kelly* stressed that the constitutionality of administrative segregation depends, "in individual cases[,] upon the existence of a *valid* and subsisting reason or reasons for the segregation, such as protection of the segregated inmates from other inmates, protection of other inmates and prison personnel from segregated inmates, prevention of escapes and similar reasons." *Id.*

> Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future.
>
> . . . We think it should be said, however, that what would be required for an intelligent and meaningful review of the case of one inmate might not be required in the case of another.

*Id.* The Supreme Court concurs that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate" and that, accordingly, "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." *Hewitt*, 459 U.S. at 477 n.9.

Most pertinent for our purposes, the *Kelly* court, in affirming the district court's enjoining the prison to revise its Ad. Seg. policy, stated the following:

> As we read the record, including the stipulated testimony of the Warden, he has never evaluated the case of either plaintiff outside the framework of certain underlying penologicial views, which are as follows [in pertinent part]: (1) That an inmate who is convicted of killing or attempting to kill a member of the prison staff automatically falls into a particular category which is separate and distinct from categories occupied by other inmates, including inmates who have been

-20-

convicted of killing or attempting to kill people in the outside world. (2) That the conviction of the inmate in question ipso facto establishes, prima facie, if not conclusively, that the inmate is a fit subject for administrative segregation for a prolonged and indefinite period of time and perhaps for the duration of his term of imprisonment. . . . *Obviously, those views working in combination make it virtually impossible for an inmate like Kelly or Parras ever to persuade the Warden that he should be returned to population. . . .*

We recognize that an inmate who while in prison commits and is convicted of what the counter-plan calls a "homicide offense" directed at a guard or other member of a prison staff may present, at least for a time and up to a point, a security problem that is not present in the case of an inmate who has been sent to the Penitentiary for having committed a similar offense in the free world. We do not think that that fact, however, permits a prison warden constitutionally to apply the other views that have been mentioned so as to keep the convicted inmate confined indefinitely in administrative segregation.

\* \* \*

*. . . It does not follow . . . that the Warden can take the view that the fact of the conviction in and of itself stands as a bar to the making of a reasonable decision that at some future time the inmate poses no threat to the security of the institution.* This does not mean, of course, that the Warden may not properly consider the underlying acts of the plaintiffs and the fact of their convictions as historical facts of their cases and as factors to be considered, among others, in determining whether after a lapse of months or even of years it is safe to terminate their segregated status. But, we do not think it permissible for the Warden to give artificial weight to the convictions or to consider them as determining or preponderant guidelines in deciding whether or not plaintiffs can safely be returned to population.

*Id.* at 401–02 (emphases added).

The district court did not clearly err in finding that Warden Harmon and Ass't Warden Moncrief acted contrary to these admonitions in *Kelly*. Harmon consistently testified at trial that seven-years' worth of clean history was irrelevant to him, and Ass't Warden Moncrief confirmed that, even if Williams proved to be "the perfect model citizen" or "model prisoner," his vote as Ass't Warden would always be that Williams remain in Ad. Seg. in light of his past transgressions. This is precisely the type of undue weight accorded to past facts that we explicitly forbade in *Kelly*, *id.* at 402, and in our first opinion in this matter, *Williams*, 277 F. App'x at 650 (citing *Kelly*, 525 F.2d at 399–400).

Also, the district court did not clearly err in finding that all of the reviews that Warden Harmon, Ass't Warden Moncrief, Ass't Warden James, Warden Harris, and Warden Evans administered lacked the requisite meaningfulness because they failed to explain to Williams, with any reasonable specificity, why he constituted a continuing threat to the security and good order of the institution. As the Supreme Court recognized in a case where it reviewed the Ohio State Penitentiary's (OSP) assignment of inmates to Supermax facilities,

> The New Policy [under review in that case] provides that an inmate must receive notice of the factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal. Our procedural due process cases have consistently observed that these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations. . . . Requiring officials to provide a brief summary of the factual basis for the classification review and allowing the inmate a rebuttal opportunity safeguards against the inmate's being mistaken for another or singled out for insufficient reason. . . .
>
> * * *
>
> If the recommendation is OSP placement, Ohio requires that the decisionmaker provide a short statement of reasons. This requirement

-22-

guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review. The statement also serves as a guide for future behavior.

*Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005).

Indeed, the same holds true here in Williams's case. And, although the defendants stress that this court already reviewed ADC's written Ad. Seg. Review Policy in our first opinion and stated that Williams received all the process he was owed, they ignore our caveat that this process was sufficient *provided that it was meaningful*. *Williams*, 277 F. App'x at 649. The ADC written Ad. Seg. Review policy that this court approved explicitly provides that the inmate must "be advised of the reasons of his/her administrative segregation in writing and a copy of the reasons will be maintained in the inmate's institutional file." If, in fact, Defendants had *meaningfully* adhered to this requirement, then this court could conclude that Williams received adequate due process. However, as already recited, the record shows that the defendants failed to apprise Williams of the reasons that he continued to pose a threat to the security and good order of the prison. *See Griggs v. Norris*, 297 F. App'x 553, 555 (8th Cir. 2008) (unpublished per curiam) (upholding the constitutionality of an Ad. Seg. policy, as applied to a particular prisoner, because, among other procedural safeguards, "the classification committee *stated in writing its reasons for the placement*" (emphasis added) (citing *Wilkinson*, 545 U.S. at 225–27)).

Finally, the defendants correctly assert that their suspicions about Williams's drug activities were valid reasons to withhold release into general population. "In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; *rumor, reputation, and even more imponderable factors may suffice* to

-23-

spark potentially disastrous events." *Clark*, 776 F.2d at 233 (quoting *Hewitt*, 459 U.S. at 474). Accordingly, "[t]he judgment of prison officials in this context . . . turns largely on purely subjective evaluations and on predictions of future behavior." *Id.* (internal quotations omitted) (quoting *Hewitt*, 459 U.S. at 474). Thus, defendant's suspicions would have been material to their decision to retain Williams in Ad. Seg., *id.*, *if* appropriate documentation were present and the same conveyed to Williams, *id.* at 234 ("To the extent that new evidence, not previously relied upon by the state in continuing an inmate's segregation, will be used as a basis for his continued segregation, . . . a brief written description of this evidence should be provided to the inmate.").

Accordingly, the district court did not clearly err in finding that defendants failed to afford Williams a meaningful Ad. Seg. Review Process, and we affirm. Similarly, regarding Williams's first point in his cross-appeal, we cannot conclude that the district court clearly erred in finding Dir. Hobbs not liable for depriving Williams of his liberty interests without due process of the law. Dir. Hobbs's unrefuted trial testimony reflects that he inadvertently failed, on only two occasions, to hold director reviews on an annual basis as ADC's Ad. Seg. policy required but that, upon realizing the error, endeavored to impress upon his staff the importance of scheduling such reviews. Moreover, Dir. Hobbs approved Williams's transition into the "step-down" program and subsequently approved Williams's release from Ad. Seg. Finally, Dir. Hobbs testified that when he reviewed Williams's status during the annual reviews, he took into consideration Williams's institutional file, his adjustment, job assignments, comments from supervisors, and anything in Williams's file. On these facts, the district court did not clearly err in finding that Dir. Hobbs conducted his annual director's reviews in a meaningful fashion.

## B. *Nominal Damages*

The defendants also challenge the district court's award to Williams of $4,846 in "nominal damages" based on a $1-per-day calculation. The district court reasoned

that, in *Fegans v. Norris*, this court affirmed a $1,500 nominal damages award in a prison litigation appeal as properly calculated on a "per violation" basis—in that case, for each instance that prison officials denied Fegans, "a follower of the teaching of the Assemblies of Yahweh," Kosher meals. 537 F.3d 897, 900 (8th Cir. 2008).

We construe *Fegans* differently. In that case, the prison officials did not appeal the nominal-damages award as too high; rather, the inmate appealed the nominal-damages award as too low. *Id.* at 908. In rejecting Fegans's argument, we stated that, "[a]side from punitive damages, the [PLRA] limits recovery for mental or emotional injury to nominal damages only." *Id.* (citing *Royal v. Kautzky*, 375 F.3d 720, 723 (8th Cir. 2004)). Accordingly, "[w]e conclude[d] that an award of $1.44 for each constitutional violation is a sufficient nominal damage award, and that the district court did not abuse its discretion in declining to award a greater amount." *Id.* (citing *Royal*, 375 F.3d at 724). Thus, in *Fegans*, we had no occasion to consider whether the $1.44-per-day award exceeded a nominal amount because the damage award's "floor," rather than its "ceiling," was at issue.

Williams's reliance on our decision in *Trobaugh v. Hall*, 176 F.3d 1087 (8th Cir. 1999) as an instance where we affirmed a per-day nominal-damages award for time spent in administrative segregation is similarly misplaced. Our decision in *Royal* squarely forecloses Williams's reliance on *Trobaugh* for the proposition that a dollar-per-day award constitutes "nominal" damages irrespective of whether each day constituted a constitutional violation. As we stated in *Royal*,

> Faithfully following the PLRA, the district court appropriately awarded Royal $1.00 in nominal damages for Royal's First Amendment violation. Royal may not recover some indescribable and indefinite damage allegedly arising from a violation of his constitutional rights.

\* \* \*

-25-

*Trobaugh* does not control Royal's case, because the *Trobaugh* court did not confront the PLRA's limitation on recovery in prisoner suits. . . . Finally, the *Trobaugh* court did not discuss whether the prisoner had been released from prison, which would have taken this case outside of [the PLRA], had it even applied. Because the *Trobaugh* court was not limited by the PLRA, as we are in this case, we decline to extend the holding from *Trobaugh* to cover a damage award subject to the PLRA's limitations.

*Royal*, 375 F.3d at 724 & n.2 (internal citations omitted).

Here, Williams's argument for a per-day nominal-damages award is similarly unavailing because he considers each day that he spent in Ad. Seg. to be a separate constitutional violation. However, the constitutional violation that Williams asserts is the denial of procedural due process because of meaningless review hearings. Therefore, we consider the faulty 60-day Classification Committee hearings to be the pertinent deprivation. Our precedents confirm that "nominal damages are the appropriate means to vindicate constitutional rights whose deprivation has not caused an actual, provable injury," and "one dollar is recognized as an appropriate value for nominal damages." *Corpus v. Bennett*, 430 F.3d 912, 916 (8th Cir. 2005) (quotation marks and citations omitted). Accordingly, Williams is entitled to no more than $1 for each procedurally defective Classification Committee hearing. Thus, based on this "per-constitutional-violation" analysis, we will reverse the district court's $4,846 nominal-damages award and remand the case to the district court for the award's recalculation.

C. *Compensatory Damages*

On cross-appeal, Williams maintains that the district court erred in declining to award him compensatory damages. We review the district court's damages award only for an abuse of discretion. *Royal*, 375 F.3d at 722. Williams acknowledges in his

brief that, "[g]enerally speaking, the PLRA requires an inmate to make a showing of physical injury before being entitled to recover emotional distress damages," (citing 42 U.S.C. § 1997e(e)), but maintains that "the record is also clear that Williams suffered physical injury directly as a result of his status in [Ad. Seg.]"

Contrary to Williams's contention, the district court did not abuse its discretion in declining to award Williams compensatory damages. The PLRA provides, in pertinent part, that "[n]o Federal civil action may be brought by a prisoner . . . for mental or emotional injury . . . without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In *Royal*, "[w]e join[ed] the majority [of circuits]" to conclude that Congress intended this provision to "limit[] recovery for mental or emotional injury in all federal actions brought by prisoners." 375 F.3d at 723. As the predicate for his purported entitlement to compensatory damages, Williams relies exclusively on the following two injuries that he claims to have suffered while in Ad. Seg.: (1) a dislocated shoulder resulting from ADC officials handcuffing his hands behind his back, a security procedure that ADC officials implement only with Ad. Seg. inmates, and (2) assorted injuries resulting from a fall that he suffered as ADC authorities transported him down a stairwell in the separately housed Ad. Seg. unit. According to Williams, he would not have suffered either of these injuries but for his incarceration in Ad. Seg. However, the district court adopted the magistrate judge's finding that "such injuries were not the direct result of his continued [Ad. Seg.] incarceration." *Williams*, 721 F. Supp. 2d at 841. Based on the record, we cannot conclude that the district court abused its discretion in this regard. Therefore, we affirm the district court's denial of compensatory damages.

D. *Punitive Damages*

Finally, contrary to Williams's remaining contention in his cross-appeal, the district court did not err in refusing to award him punitive damages. We review, under

a deferential abuse-of-discretion standard, the district court's decision to award or withhold punitive damages in a § 1983 case. *Royal*, 375 F.3d at 724.

In determining whether to award punitive damages in a § 1983 case, the factfinder must, as a threshold matter, find that a "'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Id.* (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). If the factfinder makes this threshold finding, it then must consider whether to award punitive damages in light of punitive damages' twin aims: to "(1) punish willful or malicious conduct; and (2) deter future unlawful conduct." *Id.*

In the instant case, the district court found that the defendants' continued retention of Williams in Ad. Seg. was not motivated by evil motive or intent, or reckless or callous indifference to Williams's due process rights. Rather, the district court found that, "although defendants truly believed that [Williams] was a danger to the security and good order of the institution, such belief was improper." *Williams*, 721 F. Supp. 2d at 842. Much like we did in *Royal*, "we find no reversible error" here "[g]iven the highly deferential standard of review." 375 F.3d at 724. We so find because "the district court accurately stated and applied the appropriate legal standard on punitive damages" and, "[a]s the factfinder, the district court found no 'evil motive' or 'reckless or callous indifference' in [Defendants'] actions." *Id.* at 725. Williams has not demonstrated that the district court abused its discretion.

### III. *Conclusion*

Based on the foregoing, we affirm in part and reverse and remand in part. Specifically, we reverse the district court's nominal-damages award and remand for

recalculation of nominal damages in a manner consistent with this opinion. We affirm the remainder of the district court's decision.

LOKEN, Circuit Judge, dissenting.

I respectfully dissent from Parts II.A and II.B of the court's opinion. The court errs in its uncritical reliance on Kelly v. Brewer, 525 F.2d 394 (8th Cir. 1975), a panel decision substantially undermined, if not overruled, by later Supreme Court decisions. I would reverse the grant of nominal damages and direct entry of judgment in favor of the defendant prison officials.

## I.

Sandin v. Conner, 515 U.S. 472, 485-86 (1995), established that David Williams's due-process-protected liberty interest arose only because of the duration of his administrative segregation. The Supreme Court directly addressed this duration issue in Hewitt v. Helms, 459 U.S. 460, 477 n.9 (1983):

> Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner -- which will have been ascertained when determining to confine the inmate to administrative segregation -- and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for 'proof' in any highly structured manner.

Paying little heed to this controlling law, the court errs in relying on Kelly for the following standards. First, the court errs in faulting defendants for the "undue

weight accorded to past facts that we explicitly forbade in <u>Kelly</u>." Op. at 21. Imposing this requirement is contrary to the above-quoted footnote in <u>Hewitt</u> and to the Court's extended discussion of the subjective task of assessing an inmate's threat to prison security, 459 U.S. at 474. In this regard, the proper standard was applied by the Third Circuit in <u>Shoats v. Horn</u>, 213 F.3d 140, 146 (3d Cir. 2000): recognizing that the issue is whether an inmate poses a continuing threat to prison security, the court held that continued administrative segregation may be based solely on past crimes "because predictions of likely future behavior based on a generally volatile criminal character have been upheld by the Supreme Court," citing <u>Hewitt</u>.

Second, the court errs in holding that prison officials may rely on suspicions and subjective evaluations only "*if* appropriate documentation were present and the same conveyed to Williams." Op. at 23. Again, this is contrary to <u>Hewitt</u>, 459 U.S. at 476-77. It also conflicts with the Court's discussions of the risks to security that may arise if prison officials must hold adversary hearings on such issues. <u>See</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 227-29 (2005). The court instead relies on <u>Clark v. Brewer</u>, 776 F.2d 226, 234 (8th Cir. 1985). But <u>Clark</u> referred only to "new evidence," not opinions based upon rumor and suspicion, and it cited only <u>Wolff v. McDonnell</u>, 418 U.S. 539, 564 (1974), a prison discipline case. I know of no decision prior to this that has required an evidentiary inquiry into the "rumor, reputation, and even more imponderable factors" on which prison administrators may constitutionally rely in segregating an inmate. <u>Hewitt</u>, 459 U.S. at 474.

Third, the court errs by assuming that the "meaningful" periodic review required by <u>Kelly</u>, 525 F.2d at 400, must be anything more than the review required by <u>Hewitt</u> -- one that ensures the prison is not using administrative segregation "as a pretext for indefinite confinement of an inmate." 459 U.S. at 477 n.9.[6] The error

---

[6]The Eleventh Circuit did not make this improper assumption in <u>Al-Amin v. Donald</u>, 165 F. App'x 733, 739 (11th Cir. 2006) (unpublished).

-30-

in requiring more was confirmed earlier this year, when a unanimous Court held that procedural due process concerns "whether the constitutionally requisite procedures [were] provided," not whether they "produced the result that the evidence required." Swarthout v. Cooke,131 S. Ct. 859, 862-63 (2011). The presence of constitutionally sufficient procedures is "the beginning and the end" of the due process inquiry, the Court explained. Id. at 862. By focusing on whether defendants proved "a *valid* and subsisting reason or reasons for the segregation," op. at 19, quoting Kelly, 525 F.2d at 400, the court crosses a line the Supreme Court has carefully drawn.

Fourth, the court loses sight of the proper, context-specific due process inquiry mandated by Mathews v. Eldridge, 424 U.S. 319, 334-35 (1976). "It is axiomatic that due process is flexible and calls for such procedural protections as the particular situation demands." Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 12-13 (1979). Inmates are confined in administrative segregation for a variety of reasons -- "to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer." Hewitt, 459 U.S. at 468. Relying on Kelly, the court applies a one-size-fits-all approach to the question of periodic review procedures. The duration of segregation determines the need for periodic review, and the nature of that review may vary depending on the initial reason for segregation. When an inmate is segregated for his own protection, as Williams was in 1995, no review is likely needed until the danger subsides or the inmate requests review. For prolonged segregation of inmates who "seek nothing less than to control prison life and to extend their power outside prison walls," the Court held that due process requires informal, non-adversary procedures before the initial confinement but made no mention of periodic review. Wilkinson, 545 U.S. at 227, 229. By contrast, when administrative segregation is imposed to encourage good behavior, such as not trying to escape, it may be reasonable to require that periodic reviews "give the prisoner some idea of the requirements for, and his progress toward, more favorable placement." Toevs v. Reid, 646 F.3d 752, 758 (10th Cir. 2011).

-31-

Fifth, the court errs in holding that whether a periodic review was "meaningful" is a question of fact we review for clear error. Op. at 9, citing Kelly, 525 F.2d at 400. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (quotation omitted). Determining whether the process afforded an inmate "satisfied the minimum requirements of the Due Process Clause," Hewitt, 459 U.S. at 472, may involve findings of underlying fact we review for clear error, such as whether a disputed review session in fact occurred. Whether the procedures afforded were constitutionally adequate, however, "is purely a question of law." Peery v. Brakke, 826 F.2d 740, 743 (8th Cir. 1987); see Swarthout, 131 S. Ct. at 862. Here, we are defining an adequate procedure as one that is meaningful. Therefore, whether a particular review was meaningful is a question of constitutional law we review *de novo*. Cf. United States v. Mendenhall, 446 U.S. 544, 551 n.5 (1980) (in determining the issue of Fourth Amendment seizure, "the correctness of the legal characterization of the facts appearing in the record is a matter for this Court to determine").

## II.

Applying the correct due process standards to the facts of this case, I conclude that Williams was afforded constitutionally adequate periodic reviews prior to his release from administrative segregation in March 2009. Of greatest significance is Williams's personal history:

- 1981: Convicted of murder; sentenced to life in prison without parole.
- 1982: Convicted of murder for death of another inmate.
- October 1982: Involved in violent altercation with guards.
- November 1982: Psychologist reports "he obviously enjoyed discussing some of the murders he was involved in gruesome detail"; strongly recommends he remain segregated due to "history of violence and emotional instability."

-32-

- February 1990: Major disciplinary violation involving drugs and alcohol.
- January 1994: Major disciplinary violation involving drugs and alcohol. Urine tested positive for cannabinoid.
- September 1994: Mental Health Services reports Williams "previously diagnosed as psychotic." Notes "some denial [but] history is strongly positive for polydrug abuse."
- December 1994: Major disciplinary violation; placed in administrative segregation.
- January 1995: Major disciplinary violation involving drugs and alcohol.
- December 1995: Assaulted by other inmates; ADC officials suspect drug trafficking; placed in administrative segregation for his own protection.
- January 1996: Transferred to Utah Department of Corrections for his own protection.
- July 1996: Utah disciplinary conviction for theft of property, threats to staff, and positive breath test.
- March 1999: Utah disciplinary conviction for alcohol abuse and possessing shank.
- June 1999: Returned to ADC at his request.
- October 1999: ADC mental health evaluator advises Warden Outlaw, "Williams is a known drug dealer and it is my professional belief that, if released [from administrative segregation], he will return to drug traffic and trading in drugs."
- October 2000: Mental Health Services Segregation Review Form describes Williams as "manipulative" and "malingering."
- December 2000 - June 2002: four Mental Health Services Segregation Review Forms describe Williams as "manipulative." Two describe him as "aggressive."
- July 2001: Major disciplinary violation for possession of contraband currency and marijuana.
- February 2002: Asks to enroll in anger management and substance abuse treatment courses.
- October 2002: Major disciplinary violation for refusal to obey order to be searched.
- November 2004: Major disciplinary violation for attempting to pass pills and tobacco to another inmate.

• January 2005: Major disciplinary violation for lying to staff (false claim that his headphones were missing).

Given this long history of conduct posing a severe threat to prison security, and Williams's minimal liberty interest in being released from administrative segregation, I conclude (i) he was *constitutionally* entitled to no more than annual periodic reviews;[7] (ii) it was reasonable to place the burden on Williams to persuade the reviewing correctional officials that he was no longer a serious threat to prison security if released into the general population; and (iii) due process required no more than notice of such reviews, an opportunity to be heard informally, and a cryptic response following the review advising if he had not met that burden. As the record makes clear that defendants provided Williams frequent, non-pretextual reviews that satisfied these procedural criteria, his right to procedural due process was not violated by defendants' failures to make the process more "meaningful."

The Supreme Court has emphatically warned the courts of appeals that, if state prison officials have afforded an inmate constitutionally adequate procedures in making disciplinary and classification decisions, whether those procedures "are properly applied . . . is no part of [our] business." Swarthout, 131 S. Ct. at 863. In my view, the court has failed to obey that command. I respectfully dissent.

_____

_____

[7]Cf. Wilkinson, 545 U.S. at 217, 230. Therefore, the court errs in awarding nominal damages of more than $1 per year. The perceptive reader no doubt wonders why we have not discussed the qualified immunity that so clearly protected defendants from Williams's damage claims. See, e.g., Toevs, 646 F.3d at 760-61; Senty-Haugen v. Goodno, 462 F.3d 876, 888 (8th Cir. 2006). Defendants pleaded and preserved this defense all the way to trial. The district court committed reversible error in not addressing it, but counsel for defendants inexplicably forfeited the defense by not raising it on appeal. That was an unfortunate blunder.